**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **CARLOS A. SEINO,** | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| v. | ) | **Civil Action No.** |
| | ) | **19-40101-TSH** |
| | ) | |
| **KRISTIN LADOUCEUR,SUPERINTENDENT,** | ) | |
| **NORTH CENTRAL CORRECTIONAL** | ) | |
| **INSTITUION AT GARDNER,** | ) | |
| Respondent. | ) | |

**MEMORANDUM OF DECISION AND ORDER**
**September 19, 2022**

**HILLMAN, S.D.J.**

**Background**

Carlos A. Seino ("Seino" or "Petitioner") filed a Petition Under 28 U.S.C. § 2254 For

Writ Of Habeas Corpus By A Person In State Custody (Docket No. 1)("Petition") against Kristin

Ladouceur, Superintendent, North Central Correctional Institution, Gardner, MA

("Respondent"). Petitioner was convicted in Massachusetts Superior Court of Murder in the first

degree (felony-murder) and armed robbery. He is serving a sentence of life imprisonment

without the possibility of parole on the murder conviction.  He asserts the following three

grounds for relief:

> **Ground One**: He received ineffective assistance of counsel in violation of the
> Sixth Amendment on the grounds that his counsel was incompetent, inefficient
> and inattentive the result of which was prejudicial to him.

**Ground Two**: Petitioner's right to confront adverse witnesses against him under the Sixth Amendment was violated  when the trial court permitted substitute witnesses to testify (over his objection) to findings contained in the DNA testing report, the autopsy report and the death certificate made by analysts/examiners who did not testify.

**Ground Three**: Petitioner's Due Process Rights were violated when the Commonwealth failed to turn exculpatory evidence over to him as required  under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). More specifically, he asserts he was not provided: (i) an investigator's handwritten notes and a police photograph of his injured right hand which had been lost or destroyed; (ii) evidence that the appearance of the crime scene had been altered by the Quincy Police Department ("QPD"); and (iii) evidence that the QPD had contaminated the crime scene.

## Procedural History

On September 19, 2006, a Norfolk County grand jury returned an indictment charging Petitioner with first-degree murder (on a theory of felony murder) and armed robbery. On June 8, 2008, the Commonwealth filed several motions in limine including the following: (1) to admit the testimony of a substitute medical examiner; (2) to admit the testimony of substitute witnesses from the Massachusetts State Police Crime Laboratory; (3) to allow Dr. Robin Cotton to testify as a substitute DNA analyst; and (4) to use and admit charts of DNA test results. The trial judge ruled that the substitute witnesses would be allowed to testify based on their own opinions.

A jury trial commenced on June 1, 2008, and on June 19, 2008, the jury returned a verdict finding Petitioner guilty of armed robbery and first-degree felony murder. The trial judge sentenced him to a state-prison term of life on the first-degree murder conviction with a concurrent state-prison term of a minimum of five years and a maximum of seven years on the armed robbery conviction. Petitioner timely filed a notice of appeal on June 27, 2008. In accordance with the schedule set by the SJC, Petitioner his brief in support of his appeal on

February 10, 2017[1], raising the following issues: (1) the trial court committed reversible error when it allowed multiple substitute witnesses to testify to the factual findings contained in (a) an autopsy report and a death certificate, and (b) DNA test reports, none of which were authored by any of the testifying  witnesses; and (2) the trial court committed reversible error when it allowed a DNA expert to opine that the petitioner's DNA profile matched that of a sample from the victim's clothing, where said expert was not affiliated with the lab that tested the sample and where the only testimony as to authenticity of the DNA results in question was erroneously admitted through hearsay testimony by a substitute expert who had not performed the DNA testing.

On December 13, 2017, after the SJC had heard oral argument on his direct appeal, Petitioner filed a motion for a new trial.  In his motion for a new trial, Petitioner raised the following issues: (1) he was deprived of the effective assistance of counsel where trial counsel (a) failed to object to the introduction of the lab reports authored by non-testifying experts, resulting in the loss of his constitutional right to confrontation; (b) failed to have Petitioner's DNA expert, for whom trial counsel had requested court funding multiple times, attend the exhaustive DNA testing by the Commonwealth on the only DNA samples found to have matched Petitioner; (c) failed to call at trial both a pathologist and a blood-spatter expert to challenge the expert testimony of the Commonwealth's experts, after trial counsel had requested court funding for said pathologist and blood-spatter expert; and (d) failed to present any evidence showing the pattern of DNA mishandling by the state lab at the time DNA tests were being conducted in the

---

[1] Seino's appellate counsel initially filed a motion to stay the appeal; After no movement on the case, counsel filed a motion to withdraw in 2011, and new counsel was appointed. It appears the matter was further delayed as new counsel sought to obtain evidence. The SJC vacated the stay in January 2016.

case; (2) the prosecution violated Petitioner's constitutional due process rights under *Brady v. Maryland* when (a) an investigator for the Massachusetts State Police ("MSP"), in direct contravention of the department's own policy, deliberately destroyed his handwritten investigation notes, thereby depriving the petitioner of potentially exculpatory evidence; and (b) the QPD lost a photograph that officers took of Petitioner's wounded hand when interrogating him at the police station. Petitioner also presented other claims pro se pursuant to *Commonwealth v. Moffett,* 383 Mass. 201, 208, 418 N.E.2d 585 (1983) (setting forth procedure for criminal defendant to raise certain issues pro se), specifically, ineffective assistance of counsel for improperly stipulating to police diligence in the investigation; failing to investigate alibi witnesses in a timely way; and employing an investigator with a conflict of interest. On May 8, 2018, the SJC affirmed Petitioner's convictions and denied the motion for a new trial. On July 29, 2019, Petitioner filed the instant Petition.

### **Facts**[2]

### The Murder

In the spring of 2002, Seino moved into an apartment with two roommates in Quincy, Massachusetts. By August of that year, he was significantly behind on the rent. On August 2,

---

[2] The Court adopts the SJC's findings of fact set forth in the opinion in *Commonwealth v. Seino*, 479 Mass. 463, 465-66, 93 N.E.3d 149 (2018). Such findings are presumed correct unless Petitioner rebuts said presumption by clear and convincing evidence. S*ee* 28 U.S.C. § 2254(e)(1). "The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." *Faulk v. Medeiros,* 321 F. Supp. 3d 189, 195 (D. Mass. 2018)(internal quotation marks and citation to quoted case omitted). As pointed out by the Respondent, Petitioner fails to offer new evidence or otherwise challenge the SJC's findings of fact and instead, at best, offers a different interpretation of the evidence that was before the state court, which is insufficient to overcome the presumption of correctness. *Teti v. Bender,* 507 F.3d 50, 59 (1st Cir. 2007) (petitioner does not attempt to argue he has clear and convincing evidence to overcome the presumption here. Instead, he tries to refute the appellate court's factual determinations by employing the same documents already considered by the state courts. However, describing how different parties stated different versions of events does not constitute the needed showing of clear and convincing evidence); *see also Companonio v. O'Brien,* 672 F.3d 101, 111 (1st Cir. 2012)(court cannot

Seino's roommate warned him that he would be asked to move out if he did not pay the total amount that he owed by the following day. Seino paid a portion of the amount owed to his roommate before going out for the evening.

That night, the victim spent several hours at a local Quincy bar, where he cashed two checks for a total of $603 and put the money in his jeans' pocket. At the bar, the victim drank several beers, played Keno and darts, and socialized. The victim, who appeared to be drunk , bought drinks for patrons and "flaunt[ed]" his money such that one of his friends urged him to "put [it] away." He spent approximately eighty dollars while at the bar that night.

Seino arrived at the bar at approximately midnight. He saw some people he knew and observed the victim (whom he did not know) staggering around with Keno tickets. He stayed for between twenty and thirty minutes, leaving at approximately 12:30 a.m. The victim left the bar when it closed, around 1 a.m., traveling by foot. At approximately 1:30 a.m., Seino woke up his roommate and gave him the remaining money owed in cash. Later that morning, the roommate observed Seino in front of the television listening to the Quincy public access channel, which was broadcasting the police scanner.

The victim's lifeless body was discovered at approximately 7 a.m. on a walkway behind the Quincy public library with contusions to his nose and the back of his head. Although his wallet was still on his person, most of the cash was missing. Investigators took samples from Seino's clothing, including a snippet from the left front jeans pocket and a snippet from the front of the victim's shirt, both of which had bloodstains. The DNA extracted from the jeans pocket

---

decide in the petitioner's favor unless we supplant the SJC's reasoning by adopting his view of conflicting evidence. But here the record evidence can be interpreted to support a different version the court must reject such a request.)

sample was a mixture that matched the DNA profiles of both the victim and Seino. The DNA extracted from the bloodstain on the victim's shirt matched only Seino's profile.

### The Trial

#### Seino's Tetimony

Seino testified at trial and offered weak alibi evidence to demonstrate that he did not have the opportunity to commit the crime. More specifically, he testified that he visited several bars in succession after leaving the bar where the victim had been present. The SJC found, however, that even taking Seino at his word, he could have done all that he claimed and still committed the crime. Seino also suggested another individual committed the crime and speculated that blood from a cut on his hand ended up on the victim's clothing via incidental contact at the bar.

#### The Autopsy and Death Certificate Evidence.

Dr. Richard Evans, who did not perform the autopsy testified regarding the cause of the victim's death. In doing so, he referred to statements/conclusions in the autopsy report and the death certificate, neither of which he authored.

#### Facts Surrounding Analysis of the DNA Evidence.

Red-brown stains found on the front left pocket of the victim's jeans and on the front of the victim's shirt were determined to be bloodstains. A snippet of each item was prepared for DNA analysis, and the resulting profiles were compared to Seino's DNA profile.[3] The DNA profile from the bloodstain on the jeans pocket was developed at a Cellmark Diagnostics ("Cellmark") laboratory in Maryland ("Cellmark–Maryland"). That laboratory's former director,

---

[3] In 2006, approximately four years after the murder, Seino pled guilty to attacking an individual with a machete and was required to submit a sample of his DNA for the Combined DNA Index System database ("CODIS").

Dr. Robin Cotton, testified that the DNA found on the jeans was a mixture of two profiles-- the victim was one potential contributor to the DNA sample, and the second contributor was a man.[4] When Seino's DNA became available (in 2006), an analyst from a Cellmark laboratory in Texas ("Cellmark–Texas"), Matthew DuPont, compared the profile from the jeans sample to Seino's DNA profile and opined that Seino was the second contributor. Mr. DuPont also testified to the statistical probability of such a match: one in 17.34 quadrillion of the African American population, one in 1.854 quintillion of the Caucasian population, one in 1.753 quintillion of the Southwest Hispanic population, and one in 2.475 quintillion of the Southeast Hispanic population.

The sample from the victim's shirt was processed by the MSP crime laboratory. A representative from that laboratory, Laura Bryant, testified that Seino's DNA profile matched the profile from the bloodstain on the victim's shirt. Ms. Bryant also testified to the probability of a random match of the profiles of the DNA sampled from the victim's shirt and the Seino's DNA, concluding that the likelihood of a random, unrelated person having a DNA profile that matched the sample was about one in 1.79 quintillion of the Caucasian population, one in 16.74 quintillion of the African American population, and one in 2.375 quintillion for the Hispanic population.

---

[4] The SJC noted that the State's police crime laboratory has a contract with Cellmark, a private DNA-testing laboratory, pursuant to which Cellmark provides forensic DNA-testing services. Cellmark has multiple locations across the United States and contracts with several law enforcement agencies throughout the country. The DNA evidence relating to the victim was processed and analyzed at the State police crime laboratory as well as in two different Cellmark laboratories.

*The Contested Chalks.*

Both Dr. Cotton and Ms. Bryant used charts to explain their conclusions to the jury. The charts contained data generated by other analysts and showed the raw data generated by the DNA tests: numbers or letters assigned to genetic locations and "spikes" from an electropherogram. Dr. Cotton used two DNA charts, one for the jeans' sample and one for the victim's profile. Referring to the charts, Dr. Cotton showed the jury where the genetic locations from the jeans' sample matched the genetic locations from the victim's profile. In addition, Dr. Cotton used data from an electropherogram to demonstrate to the jury how she had concluded that a second man had contributed DNA to the jeans sample. For her part, Ms. Bryant guided the jury through each step of the comparison, pointing out on the chart generated from the shirt bloodstain the numbers that matched those on the chart generated from Seino's DNA. In less detail, she also described to the jury the results of several comparisons, referring each time to tables from the report.

## Discussion

### Standard of Review

The standard of review for habeas corpus petitions brought by state prisoners is set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Under the AEDPA:

> a federal court may grant habeas relief if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." This means we look to the Supreme Court's holdings, as opposed to dicta, at the time the state court rendered its decision, while employing the following criteria.

An adjudication will be contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth' by the Supreme Court or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'".  On the other hand, a state court adjudication constitutes an unreasonable application "if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case."  An "'*unreasonable* application of federal law is different from an *incorrect* application of federal law,'" and a state court is afforded deference and latitude.

The second scenario justifying habeas relief is if the state court adjudication led to "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Though this means that a federal court will be taking a closer look at a state court's findings of fact, the fundamental principle of deference to those findings still applies.

A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."

*Hensley v. Roden*, 755 F.3d 724, 730-31 (1st Cir. 2014)(internal citations and citations to quoted authorities omitted)(emphasis and alterations in original). In administering these standards, the state court's factual findings are presumed to be correct, and they can be overcome only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

<u>Whether Petitioner is Entitled to Habeas Relief on Ground Two[5]</u>

<u>*Whether Petitioner's Confrontation Clause Rights were Violated*</u>

In Ground Two of his Petition, Seino asserts that he is entitled to habeas relief because his right to confront adverse witnesses against him under the Sixth Amendment was violated when the trial court permitted Dr. Evans, Dr. Cotton, Mr. Dupont and Ms. Bryant to testify (over his objection) to findings contained in the DNA testing report, the autopsy report and the death

---

[5] The Court will address Petitioner's stated grounds for relief out of order as the rulings on Grounds Two

certificate which were made by other analysts/examiners who did not testify. More specifically, Dr. Evans while testifying regarding the cause of the victim's death referred to statements in the autopsy report and death report— documents which he did not author. Moreover, Dr. Evans did not perform the autopsy.  Seino asserted before the SJC, and now before this Court, that allowing Dr. Evans to so testify violated his right to confront witnesses against him as it amounted to him reading testimonial hearsay statements into the record without him having the opportunity to cross-examine the medical examiner who was the person who made the statements.  Similarly, Petitioner asserts that admission of  Mr. Dupont's opinion testimony that Petitioner's DNA profile matched the DNA profile of evidence recovered from the crime scene violated his confrontation clause rights because Mr. Dupont did not develop either DNA profile, rather he relied on DNA profiles developed by other analysts. As to Dr.  Cotton and Ms. Bryant, the trial court permitted them to testify using chalks to explain their findings to the jury— Seino contends that the charts contained test results obtained or generated by other non-testifying analysts which resulted in a violation of his confrontation rights.

The SJC found that it was error for Dr. Evans to testify to hearsay statements contained in the autopsy report and death certificates. In doing so, the SJC correctly applied clearly established Supreme Court precedent which provides that under the Sixth Amendment, testimonial hearsay is not permitted at a criminal trial without the defendant having the opportunity to cross-examine the declarant. [6] Seino had objected to Dr. Evans's testimony

_____

and Three will inform the Court's ruling on his ineffective assistance of counsel claim asserted in Ground One.

[6] The SJC cited to *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S.Ct. 2527 (2009) in which the Supreme Court reiterated its holding in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 (2004). In *Melendez-Diaz*, the Supreme Court overturned prior SJC precedent and Massachusetts statutory law which had held/provided that post *Crawford*, authors of certificates of forensic analysis and the like were not subject to confrontation under the Sixth Amendment. As will become relevant in this case, the Supreme Court did not address

regarding the autopsy report and death certificate and thus, the issue was preserved.  The SJC then conducted a harmless error analysis "to determine whether [the error] was harmless beyond a reasonable doubt." *See Seino*, 479 Mass. at 467; 96 N.E.3d 149. Likewise, the SJC found it was error for the Commonwealth to permit Dr. Cotton and Ms. Bryant to use charts which showed data obtained by other experts to justify their conclusions as Seino did not have the opportunity to cross-examine the analysts who obtained the results. However, Seino had not objected to the use of such charts and therefore, the SJC reviewed the error under a "substantial miscarriage of justice standard."  The SJC found that the erroneous admission of Dr. Evan's testimony was harmless beyond a reasonable doubt and Dr. Cotton's and Ms. Bryant's erroneous use of the charts did not result in a substantial likelihood of a miscarriage of justice.  Finally, the SJC found that admission of Mr. Dupont's opinion testimony comparing Seino's DNA profile to the DNA profile of evidence at the crime scene (blood stains on the victim's clothing), which was based on DNA profiles developed by other analysts, did not violate the confrontation clause. The Court will now determine whether those findings were reasonable in accordance with the standards set forth in the AEDPA.

*Admission of Dr. Evan's Testimony Regarding the Autopsy Report and Death Certificate*

In determining whether the admission of hearsay testimony by Dr. Evans was harmless beyond a reasonable doubt, the SJC, citing to *Commonwealth v. Dagraca*, 447 Mass. 546, 553, 854 N.E.2d 1249 (2006), applied the following standard:

---

whether the admission of certificates through a non-declarant witness in that case was harmless error, instead, the Supreme Court remanded the case to Massachusetts Appeals Court to address that issue in the first instance. *Melendez-Diaz* was decided before the conclusion of Petitioner's trial.

> [1] the importance of the evidence in the prosecution's case; [2] the relationship between the evidence and the premise of the defense; [3] who introduced the issue at trial; [4] the frequency of the reference; [5] whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; [6] the availability or effect of curative instructions; and [7] the weight or quantum of evidence of guilt.

*Seino*, 479 Mass. 463, 467–68, 96 N.E.3d 149.  Thus, the SJC essentially applied the harmless error standard set forth *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824(1967) (on direct appellate review, an error at trial affecting the defendant's constitutional rights will be deemed harmless only if it can be shown to be harmless beyond a reasonable doubt)[7]. The First Circuit has noted that in light of the Supreme Court's more recent ruling in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710 (1993)(habeas petitioner must show that error "had substantial and injurious effect or influence in determining the jury's verdict), it is necessarily unreasonable for a reviewing court applying *Chapman* "to conclude that the error was harmless beyond a reasonable doubt if an error had a substantial and injurious effect on a jury's verdict."  *Faulk,* 321 F. Supp. 3d 189, 195 (D. Mass. 2018)(internal quotation marks omitted)(citing to *Connolly v. Roden*, 752 F.3d 505, 511 (1ˢᵗ Cir. 2014).

The SJC noted that Dr. Evans had testified as to his own, independent opinion regarding the cause of the victim's death.  Given that the erroneously admitted statements were cumulative of Dr. Evan's properly admitted opinion testimony, the SJC determined the "erroneously admitted statements from the death certificate and the autopsy report were of little, if any, consequence." *Seino,* 479 Mass. at 468, 96 N.E.3d 149. Moreover, other improperly admitted statements from the autopsy report, such as the length of the laceration on the victim's head,

---

[7] The SJC cited to Massachusetts case law, however, the First Circuit has recognized that the state court standard is analogous to the federal standard set forth in *Crawford. See Connolly v. Roden*, 752 F.3d 505 (1ˢᵗ Cir.

were irrelevant to whether Seino was the attacker, did not implicate him and did not detract from his defense that he did not commit the crime. Accordingly, the SJC found that the erroneous admission of such evidence "did not contribute to the guilty verdicts." *Id.*

The Court finds that Dr. Evan's testimony regarding statements made by non-declarants in the autopsy report and death certificate concerning the cause of death, while improperly admitted, were cumulative of properly admitted evidence (his own direct testimony) and the remaining statements were irrelevant and did not undermine Seino's defense.[8]  Consequently, the Seino cannot establish substantial and injurious effect on the jury's verdict and habeas relief must be denied.

*Admission of Testimony by Dr. Cotton and Ms. Bryant based on Information of Non-Testifying Declarants Contained in Chalks*

First, as noted by the Respondent, the SJC found that this issue was not preserved and, therefore, addressed the court addressed it under the substantial likelihood of a miscarriage of justice standard. The court found that there was no substantial likelihood of a miscarriage of justice given that:

> The charts did not taint the analysts' independent opinions, which … were properly admitted.  The expert's opinions were what mattered to the jury, who likely would have found the raw data incomprehensible without the accompanying expert testimony. … Because the findings contained in the charts 'had no meaningful probative value without [the] expert[s' testimony the

---

2014).

[8] The First Circuit has held that where the state court  applying the *Chapman* standard found that a constitutional error was harmless, a federal court may, in accordance with  *Mitchell v. Esparza,* 540 U.S. 12, 18-19, 124 S.Ct. 7 (1003), review that decision under the  AEDPA standard for a determination of  whether the state court's decision was a reasonable application of *Chapman*. If the answer is yes, then the petitioner is not entitled to habeas relief. If the answer is no, then the federal court must apply the *Brecht* standard to determine whether the error was harmless.  In the alternative, because the *Brecht* standard is harder to satisfy, the federal court may simply apply the *Brecht* test directly. *See Connolly,* 752 F.3d at 510-511. This Court has adopted the latter approach.

erroneous admission of these underlying facts in evidence did not result in a
substantial likelihood of miscarriage of justice.

*Seino*, 479 Mass. at 471, 96 N.E. 3d 149.

I agree with Respondent that Petitioner waived state court review of this claim by failing
to raise a timely objection at trial.  Because this claim was defaulted "pursuant to an independent
and adequate state procedural rule, federal habeas review is barred unless [Petitioner] can
demonstrate cause for the default and actual prejudice as a result of the alleged violation of
federal law, or demonstrate that failure to consider the claims will result in a fundamental
miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 732, 750 111 S.Ct. 2546
(1991)(when petitioner fails to raise his federal claims in compliance with relevant state
procedural rules state court's refusal to adjudicate claim ordinarily qualifies as an independent
and adequate state ground for denying federal review).  The Massachusetts contemporaneous
objection rule is regularly and consistently enforced by the state courts and therefore, is an
adequate and independent state ground precluding federal habeas review. *See Hodge v.
Mendonsa*, 739 F.3d 34, 44 (1st Cir. 2013)( "We have held, with a regularity bordering on the
monotonous, that the Massachusetts requirement for contemporaneous objections is an
independent and adequate state procedural ground, firmly established in the state's jurisprudence
and regularly followed in its courts.").[9]

---

[9] Federal habeas review may also be appropriate where the SJC has excused the waiver and addressed the
claim on its merits. However, the SJC, after finding that this claim was not preserved due to Petitioner's failure to
make a timely objection, conducted only a limited review to determine whether denial of the claim would constitute
a substantial likelihood of a miscarriage of justice.  The First Circuit has held that a state court's review of a
procedurally defaulted claim under a "substantial likelihood of a miscarriage of justice standard" does not constitute
a waiver of the default by the reviewing court. *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010).

"To excuse a procedural default a petitioner's cause must relate to an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule. Mere attorney error, not amounting to ineffective assistance in a constitutionally significant sense, is insufficient to constitute cause." *Burks v. Dubois*, 55 F.3d 712, 716-17 (1st Cir. 1995). Reviewing the record, there is no apparent impediment which precluded Seino's counsel from timely objecting to the experts' use of the charts on the grounds that the data reflected therein was compiled by non-testifying declarants. Therefore, there was no "cause." Seino has brought an ineffective assistance of counsel claim. Even if the Court were to assume that counsel's failure to object to the use of the charts rendered her performance substandard, Petitioner would still have to establish prejudice. However, Seino "cannot meet the high burden of showing actual prejudice. To scale this wall, a petitioner must demonstrate 'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Ortiz v. Dubois,* 19 F.3d 708, 714 (1st Cir. 1994) (quoting *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596 (1982)). In this case, Seino failed to " 'convince [the court] that there is reasonable probability that the result of the trial would have been different' absent the error." *Prou v. United States*, 199 F.3d37, 40 (1st Cir. 1999)(quoting *Strickler*, 527 U.S. at 289, 119 S.Ct. 1936)). On the contrary, as found by the SJC, the information contained in the charts was meaningless to the jury. It was the experts' independent analysis of the data which mattered, and that testimony was admissible. Accordingly, I find that Seino has failed to establish that he was actually prejudiced by the experts' use of the chalks and his habeas claim on this ground is denied.

*Admission of Mr. Dupont's Testimony Regarding DNA Comparison*

At trial, Petitioner objected to Mr. Dupont (who was based at Cellmark-Texas) testifying

based on a DNA profile developed by an analyst from Cellmark-Maryland that Seino's DNA

matched that of DNA from the crime scene. The SJC found no error because Kristin Sullivan, the

analyst from the MSP crime lab who developed Seino's DNA profile from a known sample, and

Dr. Cotton, the supervisor from Cellmark-Maryland where the DNA profile from the crime scene

was developed, both testified and were available for cross-examination. Mr. Dupont compared

the two profiles and gave his own independent opinion regarding the statistical analysis and

whether the DNA profiles matched. Therefore, there was no *Crawford* violation.  The SJC also

found that Petitioner's challenge to the admission of Mr. Dupont's testimony relying on the

testimony of Ms. Bryant and Dr. Cotton failed because their testimony was properly admitted.

In support of his claim that Mr. Dupont's testimony, which relied on results obtained by

other analysts, violated his rights under the confrontation clause, Petitioner cited to

*Commonwealth v. Tassone*, 468 Mass. 391, 11 N.E.3d 67 (2014), in which the SJC held that it

was error under Massachusetts common law to admit the testimony of a MSP analyst that the

DNA profile of a sample taken from the defendant matched the DNA profile of evidence taken

from the crime scene where both DNA profiles had been developed by other analysts who did

not testify.[10]  In making its determination, the SJC first discussed the Supreme Court's opinion in

---

[10] In his brief to the SJC, Petitioner asserted that in *Tassone*, the court held that the defendant's
confrontation clause rights had been violated when the expert testified that the defendant's DNA profile matched the
DNA profile of evidence taken from the crime scene despite not having developed either DNA profile. As discussed
*infra,* in actuality, the SJC held that admission of such testimony violated Massachusetts common law (the SJC
applied Massachusetts common law rather than attempt to resolve what it deemed an open question under Supreme
Court precedent as to the application of the confrontation clause in such circumstances). Nonetheless, it was clear
that Petitioner was arguing to the SJC that his Sixth Amendment confrontation clause rights had been violated.
Therefore, the Court finds that Petitioner presented the federal nature of this claim to the SJC. Respondent has not

*Williams v. Illinois,* 567  U.S. 50, 132 S.Ct. 2221 (2012),  in which a plurality held that it was *not* a violation of the defendant's confrontation clause rights to permit an expert to testify that a DNA profile she developed from a known blood sample of the defendant matched that of the DNA profile of evidence from the crime scene even though the prosecutor had not called as a witness either the analyst who had developed the DNA profile from the crime scene, or someone who knew the procedures and protocols of the laboratory where such DNA profile had been developed. The Massachusetts Appeals Court held that under *White*, *Tassone's* confrontation clause rights had not been violated. *See Commonwealth v. Tassone*, 83 Mass.App.Ct. 197 (2013). The SJC reversed noting that in *White* the defendant had received a bench trial, while *Tassone* had been tried before a jury. The court determined that the plurality opinion in *White* left open the question of whether there could have been a confrontation clause violation if  Ms. White had been tried before a jury and without a detailed limiting instruction.  The SJC found that it need not resolve the federal constitutional question because under the circumstances described, admission of the expert's opinion testimony violated *Tassone's* rights under Massachusetts common law. *See generally, Tassone*, 468 Mass. 391, 11 N.E.3d 67.

In finding that there was no confrontation clause violation in Petitioner's case, the SJC distinguished *Tassone* on the grounds that both the analyst who had developed Petitioner's DNA profile and an analyst familiar with the protocols and procedures of the laboratory that had developed the DNA profile from the crime scene (Cellmark-Maryland) had testified and were subject to cross-examination.  In so holding, the SJC necessarily found that Mr. Dupont's reliance on the DNA profiles developed by other analysts did not violate Massachusetts common

asserted otherwise.

law. That being the case, it can be inferred that the SJC, aware of the ruling in *White*, also necessarily determined that application of the plurality ruling mandated a finding that admission of Mr. Dupont's testimony did not violate Petitioner's rights under the confrontation clause.  The Court finds that the SJC's decision was not contrary to clearly established Supreme Court precedent and therefore, federal habeas relief on this ground is denied. Moreover, even upon *de novo* review, the Court would find that applying *White*, Petitioner's confrontation clause rights were not violated.

<u>Whether Petitioner is Entitled to Relief on Ground Three</u>

In Ground Three, Petitioner asserts that his Due Process rights were violated when the Commonwealth failed to turn exculpatory evidence over to him as required  under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). [11] More specifically, he contends that: (i)  the Commonwealth failed to preserve handwritten notes prepared by a MSP investigator, and a photograph of his injured right hand taken by the QPD; and (ii) the QPD intentionally suppressed evidence regarding the appearance of the crime scene, and withheld video footage of the crime scene and evidence that it had been contaminated. As to the former, Petitioner contends that the MSP investigator destroyed his notes in contravention of MSP policy and that QPD lost the photograph of his injured hand. As to the latter, Petitioner contends pictures of the crime scene were inaccurate and that members of the QPD altered the crime scene, including by moving the victim's body.

---

[11] Although in his Petition and supporting documentation Petitioner references the Fourth Amendment, his arguments to this Court are similar to those he made to the SJC in support of his claim that actions by the Commonwealth and law enforcement violated his Fourteenth Amendment Due Process rights. As noted by the Respondent, because Petitioner did not raise a Fourth Amendment claim to the SJC, any such claim to this Court would be subject to dismissal as unexhausted.  However, given that Petitioner is proceeding pro se, I will presume that his reference to the Fourth Amendment is inadvertent and that he is pursuing the same Due Process claims that

<u>*Whether Petitioner's Due Process Rights were Violated because the Investigator's Notes and*</u>
<u>*Photograph were not Available for Trial*</u>

As to Petitioner's claims that the Commonwealth violated his due process rights by failing to preserve investigator notes and a photograph of his injured hand, the SJC noted that the burden first rested with Seino to establish " 'a reasonable probability, based on concrete evidence,' that the evidence was exculpatory.' " *Seino*, 479 Mass. at 477, 96 N.E.3d 149 (quoting *Commonwealth v. Williams*, 455 Mass. 706, 718, 919 N.E.2d 685 (2010)(citation to quoted case omitted)).  In *Williams,* the SJC set forth the applicable standard to be applied when a defendant contends that he was denied a right to a fair trial by the Commonwealth's loss or destruction of evidence.

> When a defendant makes a claim that the government has lost or destroyed potentially exculpatory evidence, it makes sense that he or she should bear the initial burden of demonstrating the exculpatory nature of that evidence, using the … "reasonable possibility, based on concrete evidence" formulation . … [T]herefore, …the defendant will be required to meet this threshold burden in order to advance a claim for relief. If the defendant does meet the burden, then … the judge, or the court on appeal, must proceed to balance the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief.  If the defendant does *not* establish as a threshold matter that the evidence at issue is possibly exculpatory … there is no need to engage in this balancing test.

*Williams*, 455 Mass. at 718, 919 N.E.2d 685  (2010)(internal citations and internal footnote omitted).[12]

---

he brought before the SJC.

[12] The SJC found that Petitioner had not established that the notes and photograph had been destroyed in bad faith or recklessly and therefore, he could not invoke the more defendant friendly analysis that would require the Commonwealth to show that " 'the lost or destroyed evidence was not potentially exculpatory.'" *Seino*, 479 Mass at 477 n. 21, 96 N.E.3d 149 (citation to quoted case omitted). Moreover, the SJC found that the notes were destroyed in the ordinary course of business "well before the defendant came a suspect." *Id*, at 477 n. 22, 96 N.E.3d 149. While Petitioner asserts that MSP investigator destroyed his notes in contravention of department policy, he has not proffered any evidence to rebut the SJC's finding. Therefore, the question before the Court is whether, assuming no bad faith on the part of the Commonwealth, the SJC's holding violated the standards of the AEDPA.

Petitioner argues that the destruction of the MSP investigator's handwritten notes and the loss of the photograph of his injured violated his rights under *Brady*.  However, *Brady* applies where the government has allegedly failed to disclose exculpatory evidence that is within its custody and control.  The Supreme Court has articulated test to be applied where the government has lost or destroyed evidence which a defendant asserts is material to his guilt or punishment. "A due process violation may be found where the government destroys evidence.  However, the evidence must 'both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' Although a due process violation occurs whenever material exculpatory evidence is withheld, 'a different violation [ensues] when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have … exonerated the defendant[.]' Failure to preserve this preserve this 'potentially useful evidence' only violates due process if the defendant can show bad faith." *Clemente v. O'Brien*, 2015 WL 1475931. Civ. Act. Nos. 10-10279-GAO, 10-10282-GAO (Mar. 31, 2015)(internal  citations omitted)(quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 58, 109 S.Ct. 333 (1988) and *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528 (1984)).

While the standard articulated by the SJC differs slightly from that required under Supreme Court precent, the SJC's analysis of the issue appears to meet the federal standard. Nonetheless, the Court will review this issue *de novo*.  Petitioner makes conclusory allegations that the inability of the Commonwealth to provide him with the investigator's handwritten notes and the photograph of his injured right hand deprived him of evidence material to his defense. However, he does not specify how such evidence would have been used to aid his defense  does

not establish that he could not have obtained comparable evidence, and more importantly, does he establish the exculpatory value of such evidence. At best, his argument can be interpreted as suggesting that such evidence could have possibly had exculpatory value. Under established Supreme Court precedent, he must therefore show that the Commonwealth acted in bad faith. Because he has failed to due so, *see supra* note 12, he cannot establish a due process violation.[13]

### *Whether Petitioner's Due Process Rights were Violated When the Commonwealth failed to Disclose that the Police had Contaminated the Crime Scene*

Petitioner contends that the Commonwealth violated his due process rights by failing to disclose that the QPD had contaminated the crime scene, had moved the victim's body, and had provided inaccurate pictures of the crime scene. Petitioner also contends that Commonwealth withheld television footage that was favorable to his defense.  Petitioner's claims raise a straightforward *Brady* violation, however, the SJC did not find it necessary to engage in *Brady* analysis having found that "[t]here [wa] no basis in the evidence that the police altered the crime scene or moved the victim's body … . Nor [was] there evidence, beyond defendant's bald assertion, that pictures in the crime scene were inaccurate due to renovations. Finally, the defendant presented no evidence of illegal surveillance …. ." *Seino*, 479 Mass. at 478, 96 N.E.3d

---

[13] As to whether the handwritten notes and photograph had any exculpatory value, the Court notes that the SJC found that Petitioner had failed to establish how the handwritten notes would have differed from the police report that was generated therefrom or how they would otherwise have been exculpatory.  Additionally, he was able to cross-examine the investigator about his notes and the police report and any possible discrepancies between the two.  As to the photograph, the SJC found that in the first instance, Petitioner had filed to establish that such photograph ever existed. Even assuming a photograph had existed, the SJC found that Petitioner had failed to establish that it would have aided in his defense or otherwise been exculpatory as the undisputed testimony at trial, including testimony from two witnesses, was that he had an injured hand. *See Seino*, 479 Mass at 476-77, 96 N.E.3d 149. Petitioner has made no attempt to rebut the SJC's findings.

149. These findings, which Petitioner has not rebutted, are fatal to his *Brady* claim. Accordingly, he is not entitled to habeas relief on Ground Three.[14]

<u>Whether Petitioner is Entitled to Habeas Relief on Ground One</u>

Seino asserts that he received ineffective assistance of counsel in violation of the Sixth Amendment on the grounds that the following errors by his counsel rendered her performance objectively unreasonable and he was prejudiced thereby: (1) counsel failed to properly utilize the experts that had been retained in the fields of DNA, blood spatter and pathology, including among other claims, that she waived presence of a defense expert at DNA testing and failed to present expert testimony on his behalf; (2) counsel failed to timely contact potential alibi witnesses for which he had provided her names and contact information with the result that none could be located at the time of trial; (3) counsel erred by stipulating that law enforcement had been diligent in pursuing the case; and (4) counsel failed to challenge DNA evidence based on the ongoing disfunction and mishandling of DNA evidence at the MSP crime laboratory.

To establish that his Sixth Amendment right to effective assistance of counsel was violated, petitioner must establish that counsel's performance was objectively unreasonable, *and* prejudice, *i.e.,* that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052 (1984).  In concluding that Petitioner did not receive ineffective assistance of counsel, the SJC evaluated his claims under the "miscarriage of justice standard" set forth in the Mass.Gen.L. ch. 278, §33E rather than the traditional standard of *Commonwealth*

---

[14] As noted by the Respondent, Petitioner's claim regarding illegal surveillance is waived as he failed to address it in his legal argument.

*v Saferian*, 366 Mass. 89, 315 N.E.2d 878 (1974).[15] Under this more favorable standard,  the court "determine[s] whether defense counsel erred in the course of the trial and if so, whether 'whether that error was likely to have influenced the jury's conclusion.' "  *Seino*, 479 Mass. at 472 , 96 N.E.2d 149.   Because the SJC applied a standard that was more favorable to the Petitioner than *Strickland*, the Court will review its decision under the AEDPA's deferential standard. *See Knight v. Spencer*, 447 F.3d 6, 15 (1ˢᵗ Cir. 2006)( where the SJC applies its more favorable "substantial likelihood of a miscarriage of justice" standard, its decision will not be deemed to be "contrary to" the *Strickland* criterion).

<u>*Counsel's Failure to Properly Utilize Experts on Petitioner's Behalf*</u>

Petitioner contends that trial counsel was ineffective for failing to have an expert present at the crime laboratory to observe DNA testing (because the testing exhausted the entirety of the DNA sample. it could not thereafter be tested independently by Seino's expert). The SJC found that Petitioner had failed to establish harm[16] because contrary to Petitioner's contention, not all of the DNA samples had been exhausted and those that were did not match his DNA profile. The DNA which matched his blood profile, taken from the blood stain from the victim's shirt, was not exhausted and could have been tested by Petitioner's expert. On this record, Petitioner cannot establish prejudice as the result of counsel's failure to have an expert present for the testing and

---

[15] The SJC did so because Seino had been convicted of first-degree murder and the miscarriage of justice standard set forth in Chapter 278, §33E would be more favorable to him than the *Saferian* standard, which is equivalent to the *Strickland Standard*. *See Strickland v. Goguen*, 3 F.4th 45, 54 n. 14 (1ˢᵗ Cir. 2021).

[16] Although the SJC did not find it necessary to determine whether counsel's performance on this issue was substandard, it noted that the expert she had hired to attend the testing passed away before it could be performed. In thereafter waiving the presence of an expert, counsel considered that Seino had already been in prison awaiting trial for over a year and there was an expectation that the results of the testing would be favorable to him. Additionally, the laboratory was experiencing lengthy delays which likely would have pushed the testing far out into the future. Under these circumstances, the SJC found that counsel's decision was tactical and therefore, not manifestly

therefore, the SJC's determination to that effect was not contrary to or an unreasonable application of the *Strickland* prejudice standard.

Petitioner also claims that counsel was ineffective for failing to call as witnesses pathology and blood splatter experts that had been retained in preparation for trial.  The SJC noted that Petitioner asserted that the pathologist could have offered a different theory on the victim's cause of death, however, he did not present any such theory to the court.  As to the blood spatter expert, Petitioner asserted that the expert could have explained that the transfer of blood to the victim's shirt could have resulted from his injured hand brushing up against the victim as they passed each other in the bar. However, Petitioner did not submit an affidavit or other evidence to support this theory.  Moreover, counsel had utilized the experts to evaluate the Commonwealth's evidence and prepare her cross-examination. The SJC noted that counsel effectively cross-examined the Commonwealth's experts and undermined the Commonwealth's theory on cause of death and elicited evidence to support Petitioner's theory as to how the blood was transferred to the victim's shirt. Having found that Petitioner had not established that the experts' testimony would have assisted his defense and that counsel had utilized them to effectively cross-examine the Commonwealth's experts, the SJC held that Petitioner had failed to establish that counsel was ineffective. The SJC's finding that Petitioner had failed to establish that counsel's performance was deficient was not contrary to or an unreasonable application of the *Strickland* standard.

---

unreasonable. This Court concurs and would find that this was a tactical decision by counsel which is virtually unchallengeable.

### *Counsel's failure to Timely Contact Potential Alibi Witnesses*

Petitioner contends that upon counsel being engaged to represent him, he provided her with a list of witnesses that could have corroborated his alibi, but she failed to contact them in a timely manner and at the time the trial commenced, they could not be located. The SJC noted that counsel provided a sworn statement in which she denied Petitioner had provided her a list of witnesses. Assuming that he had, the SJC found for the following reasons that Petitioner was not prejudiced by the absence of said witnesses. First, Petitioner took the stand and testified as to his movements the night of the murder. However, the Commonwealth established that even had Petitioner done everything he claimed, he would still have had the opportunity to commit the murder. The SJC also noted out that Petitioner did not provide the court with the names of the alleged alibi witnesses or how their testimony would have been exculpatory given that his own testimony as to his whereabouts did not preclude the possibility that he committed the crime. The SJC's finding that on this record the Petitioner could not establish he was prejudiced by the absence of alibi witnesses comports with and is a reasonable application of *Strickland's* prejudice standard.

### *Whether Counsel erred by stipulating that Law Enforcement Diligently Pursued the Case: Counsel's Failure to Challenge DNA Evidence based on the Ongoing Disfunction and Mishandling of DNA Evidence at the Crime Laboratory*

Little discussion is warranted on Petitioner's claim that counsel was ineffective for stipulating that law enforcement was diligent in pursuing the case despite not arresting him until four years after the murder, particularly because evidence had been lost or destroyed during this delay.  Petitioner became a focus of the police investigation a few years after the murder when his DNA sample became available on CODIS as are result of his conviction for an unrelated

25

crime involving an assault with a machete. The Commonwealth intended to explain the lengthy delay to the jury by establishing that the police did not focus on Petitioner until his DNA sample became available on CODIS. Rather than have the jury speculate as to why Petitioner's DNA sample became available on CODIS or face the possibility that the nature of the conviction would be made known to the jury, counsel stipulated that the police had diligently investigated the case. In return, the Commonwealth agreed not to reference CODIS.  Petitioner also asserts that counsel was ineffective for failing to elicit evidence regarding the dy+sfunction and mismanagement of the CODIS administration of the State crime laboratory (to cast doubt on the reliability of the laboratory's testing procedures and results).  However, counsel having made the decision that it was in Petitioner's "best interest for the jury not to hear about CODIS to the jury … necessarily meant that she would not be able to elicit testimony regarding the alleged mismanagement" and malfunction of the MSP crime lab's administration of CODIS. The SJC that counsel's decision was a reasonable tactical choice and therefore. Not ineffective assistance of counsel.  Reasonable tactical choices, such as the one made my Petitioner's counsel, are virtually unchallengeable and preclude a finding that her conduct violated the *Strickland* standard.  Accordingly, the SJC's determination did not violate the AEDPA standard.

<u>Conclusion</u>

For the foregoing reasons, the Petition Under 28 U.S.C. § 2254 For Writ OF Habeas Corpus By A Person In State Custody (Docket No.1), is ***denied***.

<u>Certificate of Appealability</u>

The statute governing appeals of final orders in habeas corpus proceedings provides that an appeal is not permitted "[u]nless a circuit justice or judge issues a certificate of appealability."

26

28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a "substantial showing," a petitioner must demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000) (internal quotation marks omitted). This is a low bar; a claim can be considered "debatable" even if every reasonable jurist would agree that the petitioner will not prevail. *Miller-El v. Cockrell*, 537 U.S. 322, 338, 123 S.Ct. 1029 (2003).  In ruling on an application for a certificate of appealability, a district court must indicate which specific issues satisfy the "substantial showing" standard. 28 U.S.C. § 2253(c)(3).

      I deny the certificate of appealability with respect to all of Petitioner claims as I have found such claims to be procedurally defaulted or that the SJC's determination of no error was not contrary to or an unreasonable application of Supreme Court precedent. Under the circumstances, I do not find that reasonable jurists could debate whether these claims were adequately addressed by the Court, nor are   the issues presented adequate to deserve encouragement to proceed further.  Therefore, a certificate of appealability is denied.

      **So Ordered.**

                                   **/s/ _Timothy S. Hillman_**
                                   TIMOTHY HILLMAN
                                   SENIOR DISTRICT JUDGE